# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:17CR149-3

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| RODRIGO CRUZ PEREZ, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Defendant's Motion to Suppress (# 43) and Memorandum in Support (# 43-1). The Government filed a Response to Defendant's Motion to Suppress (# 50). On March 27, 2018, the undersigned conducted a hearing and heard evidence from the Government and considered evidence stipulated to by the Government and Defendant. Post-hearing, Defendant submitted a Supplemental Brief in Support of Motion to Suppress (# 57), and the Government filed a Supplemental Response to Motion to Suppress (# 60). Having carefully considered the evidence and arguments of counsel, the Court enters the following Findings, Conclusions and Recommendation.

## FINDINGS AND CONCLUSIONS

### I.    Procedural Background

On December 5, 2017, Defendant was charged in two counts of a three-count Bill of Indictment (# 21). In Count One of the Bill of Indictment, Defendant was charged with conspiracy with intent to distribute methamphetamine and cocaine, in violation of 21 U.S.C. § 846 and § 841(a)(1). In Count Three, Defendant was charged with possession with intent to distribute methamphetamine, in violation of 18 U.S.C. § 841(a)(1). See Bill

Indict. (# 21).  On December 13, 2017, a Superseding Bill of Indictment (# 24) was filed, which corrected the statutory reference in Count Three from 18 U.S.C. § 841(a)(1) to 21 U.S.C. § 841(a)(1).

On February 5, 2018, Defendant filed his Motion to Suppress (# 43) and Memorandum in Support (# 43-1).  In Defendant's motion, he moves to suppress a money order receipt and statements allegedly made by him during the execution of a search warrant (# 43).  On February 12, 2018, the Government filed its Response to Motion to Suppress (# 50).

On March 27, 2018, the Court held a hearing on Defendant's Motion.  At the end of the hearing, Defendant's counsel made an oral motion for leave to file an additional brief.

On April 20, 2018, Defendant filed a "Supplemental Brief in Support of Motion to Suppress" (# 57).  In the Supplemental Brief, Defendant moves to suppress a money order receipt, statements allegedly made by him during the search of a home or residence, and the results of a "protective sweep" of a home.  On May 3, 2018, the Government responded on May 3, 2018, with "Government's Supplemental Response in Opposition to Defendant's Motion to Suppress" (# 60).

## II.    Factual Background

### A.    Government's Evidence.

#### 1.    Jason Allen

Special Agent Jason Allen ("SA Allen") was called as a witness by the Government. SA Allen is a Special Agent with Homeland Security Investigations and has been so employed since February of 2006 (Tp 7-8).  SA Allen primarily investigates narcotics

violations (Tp 7-8). SA Allen has led or participated in dozens of drug smuggling cases over the course of his career (Tp 8-9).

On October 26, 2017, SA Allen was the case agent for the investigation of Ignacio Luna Cruz, who is the nephew of Defendant (Tp 8-9). SA Allen and other agents were conducting surveillance of Ignacio Luna Cruz (Tp 10). Around 7:00 p.m. on that date Ignacio Luna Cruz was a passenger in a vehicle operated by Geraldo Luna Cruz that was stopped by a North Carolina Highway Patrol Trooper on Leicester Highway, not far from the community of Leicester (Tp 10, 33-34, 44-45). At the time of the vehicle stop, Ignacio Luna Cruz began using his cellular telephone (Tp 14, 32-33). During a search of the motor vehicle, a quantity of cocaine was discovered (Tp 10).

SA Allen and Agent David Miller responded to the scene of the stop and interviewed the operator of the motor vehicle, Geraldo Luna Cruz (Tp 45). Geraldo Luna Cruz told the officers he and Ignacio Luna Cruz had obtained the cocaine from a house located at 30 Icenhower Road. Geraldo Luna Cruz further stated there were additional controlled substances at the residence, which were in a back bedroom on the left of the front doorway at the end of a hall behind a drawer in a nightstand (Tp 10-11, 16). Geraldo Luna Cruz further stated there were multiple people who lived at the residence who worked at a nearby tomato farm (Tp 11).

The officers were concerned that Ignacio Luna Cruz could be using his cell phone to call back to the residence at 30 Icenhower Road to alert persons there that Cruz had been stopped and to move or otherwise conceal the drugs that were inside the residence (Tp 14, 32-33). SA Allen determined it was necessary for a protective sweep or seizure to be

3

performed on the residence to prevent the destruction or concealment of the drugs while Agent Miller traveled to Burnsville, North Carolina, to get a State Superior Court Judge to sign a search warrant for the residence at 30 Icenhower Road (Tp 12-14).

SA Allen and other agents then traveled to 30 Icenhower Road to conduct the protective sweep or seizure of the residence arriving between 8:30 and 9:00 p.m. (Tp 12-13, 32, 45). The agents consisted of SA Allen, SA Adrian Herrera, SA Conboy, SA Sean Walton, Agent Paul Criswell, SA Dave Oglesby, Taskforce Officer Mitch McAbee and Taskforce Officer Jeff Austin (Tp 13). The officers were all equipped with marked police bulletproof vests, badges, police markings, holsters, and firearms (Tp 15). The officers arrived at the residence in four or five vehicles (Tp 46).

SA Allen testified that the officers knocked on the door of the residence, which was a mobile home, stated they were the police and entered the residence with firearms drawn, including rifles (Tp 15, 34, 46-48). Upon entry, the officers encountered four (4) individuals inside the living room area of the residence (Tp 15, 48). Everyone in the living room was directed to lie down on the floor, and they all were handcuffed (Tp 18, 34, 48-49). The couch in the living room was cleared of weapons and everyone was then placed upon the couch (Tp 18, 52).

Defendant was in the far bedroom left of the front door by agents Walton and Conboy (Tp 16-17, 49). Defendant was brought out of the room and was made to lie down on the floor in the hallway and was handcuffed (Tp 17, 34, 49-50). When SA Conboy and Walton were outside of the bedroom where Defendant was located, they were calling out and yelling: "Police, police, come out, open the door" and "get down, get down" (Tp 34-35,

4

49). Defendant was brought out to the couch where the other persons were located, and he was placed upon the couch (Tp 51-52). After ten or fifteen minutes, the handcuffs on all individuals, including Defendant, were removed (Tp 18, 52).

At some point, SA Allen asked Defendant if he would talk to SA Allen, and they stepped out to the front porch of the residence (Tp 19-21, 52). SA Allen was speaking to Defendant in English, and SA Herrera was translating into Spanish (Tp 20). Three or four other agents were standing on the porch or were standing at the bottom of the porch, which was approximately 6x8 feet in size (Tp 53-54). If Defendant had wanted to leave the porch, he would have had to have walked through some of the other agents to get off the porch (Tp 55).

SA Allen asked Defendant if he spoke English. Defendant stated he did not (Tp 21-22). SA Herrera then told Defendant in Spanish that he would interpret (Tp 22, 56). SA Allen told Defendant that the officers were there looking for drugs, and the officers knew drugs were in the house (Tp 22). SA Allen further told Defendant it would be better for Defendant to tell SA Allen about the drugs (Tp 37, 57). SA Allen also told Defendant that if Defendant did not tell about the drugs, it would "go bad" for him (Tp 58).

SA Allen told Defendant multiple times that he was not under arrest, and if he was honest, Defendant would not be arrested (Tp 23-24, 36, 37). SA Allen also told Defendant he was going to have a narcotics dog come to the house, and the dog would find the drugs (Tp 23). Further, SA Allen told Defendant that if he tried to conceal the drugs or lied to the officers about where the drugs might be, there would be problems and Defendant would be arrested (Tp 23-24, 37-38, 58). Defendant did not ask to terminate the conversation or

5

ask for any accommodation (Tp 25). Defendant told SA Allen and SA Herrera drugs were in the far-left bedroom from the door at the end of the hall (Tp 23). Defendant further stated that Ignacio Luna Cruz had been to the residence earlier that evening to retrieve drugs (Tp 38). Defendant also advised that he watched the drugs for Ignacio Luna Cruz (Tp 38). Finally, Defendant advised that he feared members of the drug organization would harm his son in Mexico (Tp 38).

It was a very cold night and the conversation was very brief, lasting only a couple of minutes (Tp 25, 32). Defendant was not arrested, and handcuffs were not placed back upon him (Tp 26). No one discussed with Defendant his immigration status (Tp 27). Defendant was never read his Miranda rights during the porch conversation (Tp 31, 39).

At the time of the conversation, the officers had holstered their firearms, and any rifles would have been secured back in a vehicle or slung around the body of the officers (Tp 56). Then, Defendant, SA Allen, SA Herrera, and the other officers went back inside the mobile home (Tp 25, 56).

The officers waited at the house for approximately one and one-half hours for the search warrant to be obtained (Tp 62). At approximately 11:30 p.m., Agent Miller obtained the search warrant and sent a copy to SA Allen by taking a photograph of the search warrant with Agent Miller's cell phone and sending the photograph to SA Allen's cell phone. (Tp 63). Before the search warrant was executed, a Buncombe, County officer and canine went through the house, and the canine alerted at multiple places within the back bedroom, which is located left of the front door (Tp 29). The search warrant application and the subsequent warrant were not based upon any information that had been provided by Defendant (Tp

6

28).

Once the search warrant was obtained, SA Allen asked Defendant to show the officers where the drugs were located (Tp 28). Defendant then took the officers to the back bedroom, located to the left of the front door, and pointed at a drawer and said the drugs were "in there" (Tp 28). The officers pulled a drawer out, and drugs were found, which was consistent with the information provided by Geraldo Luna Cruz (Tp 28-29, 39). Defendant also told the officers about an iPhone box located on a night table that contained drugs (Tp 39). Methamphetamine was found in the box (Tp 39).

When explaining why SA Allen did not provide Miranda rights to Defendant, SA Allen testified he had no "indications" of arresting Defendant (Tp 42). SA Allen was simply trying to obtain additional information in the case against Ignacio Luna Cruz, and it wasn't until sometime later, through statements of other defendants that pointed to the involvement of Defendant in cutting and re-bricking the drugs to be sold, that SA Allen decided to charge Defendant (Tp 42-43). On the night of the seizure and the search, SA Allen considered Defendant to just be one of six people who were living in the house (Tp 43).

### 2. Adrian Herrera

Special Agent Adrian Herrera ("SA Herrera") was called as a witness by the Government. SA Herrera is employed as a Special Agent with Homeland Security Investigations and has been so employed since 2006 (Tp 68-69). Prior to his employment with Homeland Security Investigations, he was a Border Patrol Agent in Laredo, Texas (Tp 69). SA Herrera assisted in the surveillance and search of the home located at 30 Icenhower

7

Road on October 26-27, 2017 (Tp 70-71).

While preparing to enter the home at 30 Icenhower Road, SA Herrera testified that there were eight to ten officers who traveled to the home and not more than six vehicles (Tp 74-76). When approaching the residence, SA Herrera saw there were lights on in the residence and assumed that persons were inside the mobile home (Tp 77-78). Upon approaching the front door to the residence, SA Herrera and the other officers were wearing protective vests and carrying firearms (Tp 75).

SA Herrera was the first law enforcement officer to enter the residence (Tp 73, 119-120). SA Herrera approached the front door and waited ten to fifteen seconds to be sure that he had enough law enforcement officers with him (Tp 76, 116, 134). SA Herrera then opened the door, entered the house, and yelled in both English and Spanish: "Police, police, let me see your hands, let me see your hands" (Tp 78-80, 117-119, 135). SA Herrera had his pistol (Tp 135).

Upon entering the residence, SA Herrera saw five to seven men sitting in the living room of the mobile home (Tp 78, 136). SA Herrera then began handcuffing the men (Tp 80). SA Herrera also heard SA Walton, who had gone down a hallway to the left of the front door to a door of a bedroom yelling in both English and Spanish, "Police, police, come out with your hands up" (Tp 83-84). SA Herrera then heard SA Walton say in Spanish, "Get on the ground, don't move." SA Herrera testified that the officers, regarding Defendant, had to "just go hands-on and arrest him-not arrest him-but secure him" (Tp 84-85).

Defendant was then pulled to the kitchen area of the mobile home (Tp 85-138). SA

Herrera told the men in the living room that they were not under arrest, they were handcuffed for the safety of the officers, and the safety of the men (Tp 85). After a while, SA Herrera told the men in Spanish that the officers were going to remove the handcuffs, but the men should keep their hands where the officers could see them, to cooperate, and be patient (Tp 86). The men were in handcuffs for less than ten minutes (Tp 87). SA Herrera stated that at the time the house was being secured, nobody was free to leave (Tp 121-122). After the protective sweep and seizure were complete, SA Allen asked Defendant to have a conversation with SA Allen on the porch (Tp 89).

SA Allen asked SA Herrera to translate (Tp 90). SA Herrera testified the conversation was six feet down from the porch and not on the porch to keep the other men who had been seized inside the mobile home from overhearing the conversation (Tp 109-110, 127).

SA Herrera told Defendant he was not under arrest, in Spanish, and SA Allen wanted to know where the drugs were, and if Defendant would cooperate and tell SA Allen where the drugs were, SA Allen would not arrest Defendant (Tp 90, 130). Defendant responded that he could show them where the drugs were, and there were drugs in Defendant's bedroom in two nightstands (Tp 91-92, 130-131). During this conversation near the porch, neither SA Allen nor SA Herrera were displaying their firearms (Tp 93). Other officers were present, and they were about ten (10) feet away (Tp 94-95). The conversation lasted less than two to three minutes (Tp 96). Defendant was then moved back inside the mobile home (Tp 96).

Once Defendant and SA Herrera went back inside the mobile home, SA Herrera

9

talked to all the men in the front living room area about their immigration status, but immigration offenses were not a part of the investigation (Tp 99). SA Herrera was trying to keep the men calm and trying to keep them from wanting to fight or run (Tp 100). SA Herrera did not believe Defendant or any of the other men were under arrest (Tp 101).

SA Herrera testified that Miranda warnings were intentionally not given to Defendant but if SA Herrera had it to do all over again he would have provided Defendant with his Miranda warnings (Tp 102-103, 114). It is SA Herrera's policy to give Miranda warnings to subjects who are interviewed even if the subject is not in custody (Tp 104). SA Herrera was under the impression Defendant was not arrested (Tp 105).

Neither Defendant nor any of the other men were arrested that night (Tp 109). However, SA Herrera was of the opinion the men were probably thinking they were going to be arrested for immigration violations (Tp 111). When the handcuffs were taken off the men, including Defendant, they were all free to leave if SA Allen told them they could (Tp 122). To leave the mobile home Defendant would have had to have announced that he wanted to leave and received permission from SA Allen (Tp 124).

### B. Exhibits

Defendant and the Government stipulated into evidence the following documents:

(# 43-2)  An Application for Search Warrant and Search Warrant dated October 26, 2017 signed by North Carolina Superior Court Judge Gary Gavenus;

(# 43-3)  A Return of Service of Search Warrant dated October 27, 2017; and

(# 43-4)  A money order receipt.

## III. ANALYSIS

## A.    The Warrantless Protective Seizure

The Fourth and Fourteenth Amendments guarantee the rights of individuals to be free from unreasonable searches by the government. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2001) (internal citation and quotations marks omitted).

However, the Supreme Court has recognized that "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness'." Id. (internal citation and quotation marks omitted). Hence, "the warrant requirement is subject to certain reasonable exceptions." Id. "[A] police officer may search a home without a warrant if, in an emergency, 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" Hunsberger v. Wood, 570 F.3d 546, 553 (4th Cir.2009) (quoting Mincey v. Arizona, 437 U.S. 385, 394, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978)).    The court looks at the "totality of circumstances" to determine whether an exigency exists that justifies an officer acting without a warrant.  Missouri v. McNeely, ____ U.S. ____, 133 S.Ct. 1552, 1559, 185 L.Ed.2d 696 (2013).    However, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." King, 131 S.Ct. at 1860 (quoting Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)). "The Government bears the burden of demonstrating exigent circumstances." United States v. Willis, 443 Fed. App'x 806, 807 (4th Cir.2011) (citing Welsh v. Wisconsin, 466 U.S. 740, 749-50, (1984)).

The Fourth Circuit has "articulated a nonexhaustive list of factors to consider in determining whether exigent circumstances are present":

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

United States v. Moses, 540 F.3d 263, 270 (4th Cir.2008) (quoting United States v. Turner, 650 F.2d 526, 528 (4th Cir.1981)).  Furthermore, the Fourth Circuit has explained that exigent circumstances exist "where police officers

(1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant." <u>Moses</u>, 540 F.3d at 270 (quoting <u>United States v. Cephas</u>, 254 F.3d 488, 494-95 (4th Cir.2001).

<u>United States v. Holloman</u>, No. 1:15CR246-1, 2015 WL 5824031, at *3-4 (M.D.N.C. Oct. 6, 2015).

From the evidence, it appears that SA Allen and Agent Miller had probable cause to believe that controlled substances were present at the residence at 30 Icenhower Road, Leicester, North Carolina. After cocaine was found in the vehicle operated by Geraldo Luna Cruz, Geraldo Luna Cruz told officers that he and Ignacio Luna Cruz had obtained the cocaine from the residence at 30 Icenhower Road. Geraldo Luna Cruz further told officers there were additional controlled substances behind a drawer in a bedroom of the residence (Tp 10-11). Geraldo Luna Cruz also told the officers there were multiple people who lived at the residence and the residence was used as a location to store and conceal drugs (Tp 12). Agent Miller then left to prepare and present a search warrant which was issued by North Carolina Superior Court Judge Gary Gavenus after finding probable cause to believe drugs were in the residence (# 43-3) (Tp 12).

SA Allen had a reasonable belief that evidence of the controlled substances might be destroyed before a search warrant could be obtained. SA Allen had been told by the North Carolina Highway Patrol Trooper who stopped the vehicle, in which Ignacio Luna Cruz was riding as a passenger, that Ignacio Luna Cruz was talking on a cell phone when the stop was made. This caused SA Allen to be concerned that Ignacio Luna Cruz was calling one of the multiple people who lived in the residence at 30 Icenhower Road, and he could be instructing

them to move or conceal the controlled substances (Tp 14).

There was a high degree of urgency involved because of how easily controlled substances can be destroyed or moved.  See United States v. Sacey, 846 F.2d 1439, 1444-45 (D.C. Cir. 1988), United States v. Moore, 956 F.2d 843, 850 (8th Cir. 1992). Controlled substances, such as cocaine and methamphetamine, can be destroyed quickly by use of a sink or commode.  To obtain the search warrant Agent Miller had to prepare the application, supporting affidavit, and search warrant and then travel an hour to Burnsville, North Carolina, to take it to the residence of Judge Gavenus, who was the only judge available (Tp 61, 63-64).  This would leave approximately three (3) hours of time during which the controlled substances could have been moved or destroyed.

Based upon the foregoing, it is the opinion of the undersigned that there was a high degree of urgency involved, due to the distance of travel to Burnsville, North Carolina, a long length of time was needed in order to obtain a search warrant, the officers had a reasonable belief that controlled substances were being destroyed and the controlled substances could be easily destroyed.

Based upon the foregoing, the warrantless protective seizure by SA Allen and his supporting officers to obtain control of the residence pending the issuance and execution of the search warrant complied with the Fourth Amendment.

**B.      18 U.S.C. § 3109.**

18 U.S.C. § 3109 provides as follows:

> Section 3109.  Breaking doors or windows for entry or exit.

> The officer may break open any outer or inner door or window of

13

> a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Defendant contends that the officers did not "knock and announce" before they entered the residence, and as a result, all references to Defendant's presence at the residence and evidence eventually seized should be suppressed.

SA Allen testified the officers complied with 18 U.S.C. § 3109 known as the "knock and announce" statute by knocking on the door and stating that the officers were the police (Tp 15). On the other hand, SA Herrera, the first agent through the door, testified that he did not "knock or announce" before he and the other officers went through the unlocked door (Tp 75-76, 116-117).

> Historically, the remedy for a violation of the "knock and announce" rule has been exclusion of the evidenced seized following the unlawful entry. This ended dramatically in 2006 with the Supreme Court's 5-4 decision in Hudson v. Michigan, 547 U.S. 586, 599 (2006), in which the majority held it both unnecessary and inappropriate to exclude evidence due to a "knock and announce" violation. Rather than exclusion, the majority concluded that civil laws suits in which prevailing parties are awarded attorney's fees and "increasing professionalism of police forces, including a new emphasis on internal police discipline" were adequate to deter future violations of the rule. Id. at 598-99 (citing cases in which lower federal courts have allowed "colorable knock-and-announce suits to go forward, unimpeded by assertions of qualified immunity," including Gould v. Davis, 165 F.3d 265, 270-71 (4th Cir.1998)). Accord United States v. Ramos-Cruz, 667 F.3d 487, 503 (4th Cir. 2012) (noting, per Hudson v. Michigan, "that the exclusionary rule does not apply to knock-and-announce violations").

Carl Horn, III, Fourth Circuit Criminal Handbook, § 7 (Matthew Bender, 2018).

A further exception to the "knock and announce" rule is allowed by a showing of "exigent circumstances." Richards v. Wisconsin, 520 U.S. 385, 387 (1997). In Richards, the

14

Supreme Court approved a no knock entry where it would inhibit the effective investigation of the crime by allowing the destruction of evidence. Id. at 394. As stated previously, exigent circumstances existed in the mind of SA Allen and the other officers as they traveled to the residence. No matter whether the testimony of SA Allen is accurate, or that of SA Herrera is accurate, the result is the same, that being the Exclusionary Rule does not apply.

The undersigned will RECOMMEND that Defendant's Motion to Suppress, due to the alleged violation of 18 U.S.C. § 3109, be denied.

### C. Statements of Defendant

Defendant contends that the statements made by him to SA Allen and SA Herrera, after the exigent sweep and seizure of the residence, should be suppressed on the basis that the statements were made during a custodial interrogation without Defendant being advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The Government contends that Defendant was not in custody for Miranda purposes, and as a result, the officers were not required to advise Defendant of the Miranda warnings.

The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the suspect's freedom of action is curtailed to a degree associated with formal arrest. Berkemer v. McCarty, 468 U.S. 420, 440 (1984). The key question is whether when viewed objectively, a reasonable man in the suspect's position would have understood his position as being "in custody." Id. at 422.

In United States v. Hashime, 734 F.3d 278 (4th Cir. 2013) the Fourth Circuit Court of Appeals reviewed some of the relevant facts to consider in making the "in custody" determination:

Facts relevant to the custodial inquiry include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." United States v. Day, 591 F.3d 679, 696 (4th Cir. 2010) (quoting United States v. Weaver, 282 F.3d 302, 312 (4th Cir. 2002)) (internal quotation marks omitted). Also pertinent are the suspect's isolation and separation from family, see United States v. Griffin, 7 F.3d 1512, 1519 (10th Cir. 1993), and physical restrictions, United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990).

Hashime, 734 F.3d at 283.

Other facts to consider are that, although Defendant was advised he was not under arrest, he was not told he was free to leave at any time. See United States v. Colonna, 511 F.3d 431 (4th Cir. 2007). In the instant case, the evidence shows that Defendant was in a bedroom dressed in a t-shirt and pants when eight (8) officers came into the residence where he lived without a search warrant and without knocking and announcing their presence or just announcing their presence before coming through the door of the residence. (Tp 117, 135). The officers were all armed with either a pistol or a rifle, and their firearms were drawn (Tp 15, 34, 46-48).

Defendant was taken out of his bedroom by officers yelling at him to come out and get down (Tp 84). Defendant was further made to lie down on the floor and then was handcuffed (Tp 17, 34-35, 49). The officers all had on law enforcement vests, insignia, and firearms (Tp 15). Defendant was then taken to the living room of the home, where he and the other men in the home were placed on a couch for ten to fifteen minutes while they were in handcuffs (Tp 18, 52). After the handcuffs were removed from Defendant, he was taken out into cold weather and placed either on a porch, where other officers were located, or just

16

off the porch where other officers were located (Tp 127-129). Defendant was told he was not under arrest; however, he was not told he was free to leave and <u>Miranda</u> warnings were never provided to him. If Defendant had wanted to leave the area, either on or near the porch, he would have had to have walked through three or four other officers.

Defendant was told if he was honest with the officers he would not be arrested, but if he tried to conceal drugs or lied to them, it would go very bad for Defendant (Tp 58). Defendant was told, "If you are honest with us you will not be arrested. If you don't tell us where the drugs are you will be arrested" (Tp 23-24, 37-38, 58). Defendant then told the officers there were in fact drugs in the house, and he advised the officers where they were located (Tp 23). This conversation lasted several minutes (Tp 25, 32).

Defendant was then taken and placed back inside the mobile home with the other men, for approximately two and one-half hours, until the search warrant was sent to the officers. Defendant was then asked by the officers for him to show them the location of the drugs, and Defendant did so (Tp 28-29).

While waiting for the issuance of the search warrant, SA Herrera continued to talk to Defendant and the other men in the residence to keep them from fighting or trying to run (Tp 100). In his conversation with Defendant and the other men, SA Herrera developed the opinion that the men thought they were going to be arrested for immigration violations (Tp 111). Lastly, SA Herrera testified that Defendant and the other men would not have been allowed to leave the mobile home by the officers unless the case agent, SA Allen, approved it (Tp 122-125).

Applying the foregoing facts to the comparable cases of <u>United States v. Hargrove</u>,

625 F.3d 170 (4th Cir. 2010), United States v. Colonna, 511 F.3d 431 (4th Cir. 2007), United States v. Hashime, 734 F.3d 278 (4th Cir. 2013), United States v. Parker, 202 F.3d 417 (4th Cir. 2011), and United States v. Barmore, No. 5:14-CR-41-07, 2015 WL 1585833 (N.D. W.Va. 2015), compels the undersigned to find that Defendant was in custody during the questioning by the officers, and his rights under Miranda should have been provided to him. Facts which were weighed in favor of this determination are the entry of the officers into the residence without a warrant, with their weapons drawn, and either little or no warning.

Other circumstances supporting the conclusion Defendant was "in custody" are that Defendant was taken out of his bedroom and made to lie on the floor while handcuffed, the fact that although the officers told Defendant he was not under arrest they did not tell him he was free to leave. Further, Defendant was not, in fact, free to leave unless he obtained permission. Hargrove and Colonna particularly direct the Court's attention to the following facts: Defendant was never told he was free to leave, Defendant was not in fact free to leave, and Defendant was never told he did not have to respond to questions. The officers did tell Defendant he was not under arrest, but those statements are outweighed by all the other circumstances and facts that show a reasonable man in Defendant's position would have understood that he was, in fact, in custody. The appropriate warnings should have been provided to Defendant and they were not.

The undersigned will RECOMMEND to the District Court that Defendant's Motion to Suppress all statements of Defendant to officers and Defendant's action in showing the officers where drugs could be found in the bedroom be ALLOWED.

### D. The Receipt

Finally, Defendant moves to suppress a photograph of a money order receipt (# 43-4) found in Defendant's bedroom, which was taken during the execution of the search warrant issued by Judge Gavenus. Defendant contends that the search warrant did not authorize the seizure of the receipt, and it was not listed on the List of Property seized (# 43-3). The search warrant authorized the seizure of "records to indicate residency and/or ownership" (# 43-2). The receipt is such an item and falls within the definition contained in the search warrant. See United States v. Dargan, 738 F.3d 643 (4th Cir. 2013).

Defendant's counsel was provided with a copy of the receipt, and the failure to list the receipt on the inventory is of no consequence. Indeed, the receipt was not seized. Instead, a photograph was taken of the receipt. The undersigned will RECOMMEND to the District Court that Defendant's Motion to Suppress the photograph of the receipt be DENIED.

## RECOMMENDATION

**IT IS THEREFORE RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress (# 43) be **GRANTED**, in **PART**, and **DENIED**, in **PART**, as follows:

(1)   The Motion to Suppress the warrantless seizure be DENIED;

(2)   The Motion to Suppress the entry into the residence, based upon 18 U.S.C. § 3109, be DENIED;

(3)   The Motion to Suppress Defendant's statements be ALLOWED; and

(4)   The Motion to Suppress the photocopy of the receipt be DENIED.

Signed: July 27, 2018

Dennis L. Howell
United States Magistrate Judge

**TIME FOR OBJECTIONS**

The parties are hereby advised that, pursuant to 28, United States Code, Section

636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, written objections to the

findings of fact, conclusions of law and recommendation contained herein must be filed

20

within fourteen (14) days of service of the objections.  Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g denied</u>, 474 U.S. 1111 (1986); <u>United States</u> <u>v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208 (1984).